McNulty vs. N. O., C. & L. R. R. Co.

No. 13,181.

B. J. McNULTY vs. NEW ORLEANS, CITY AND LAKE RAILROAD COMPANY.

SYLLABUS.

The proof disclosing that a person having no contractual relations with a street railroad corporation, goes upon its track at a late hour of the night, in an obscure and unfrequented locality, and has a collision with its engine, by means of which he suffers an injury, he is without right to recover damages because of his contributory negligence, even if it be conceded that the company's employees were not without fault.

But if the proof shows that the head-light of the engine was burning, that the bell was ringing, and the speed of the engine in accordance with regulations, a mere trespasser is without any ground of complaint. (Snyder vs. Railroad Company, 42 Ann., 302.)

APPEAL from the Civil District Court, Parish of Orleans.— Ellis, J.

Parkerson & Tobin for Plaintiff, Appellee.

Denegre, Blair & Denegre for Defendant, Appellant.

The opinion of the court was delivered by

WATKINS, J. This is an action against the defendant for the recovery of thirty thousand dollars damages, which the plaintiff alleges he sustained on account of the personal injuries that were inflicted upon him by a switch-engine which ran against him and knocked him down and ran over him, breaking both his legs in such manner as to necessitate their amputation.

The answer was a general denial, coupled with the averment that the collision of which the plaintiff complains was "wholly caused or contributed to by the plaintiff's own negligence."

The case was tried by a jury who rendered a verdict in favor of the plaintiff for the sum of $750.00, and from the judgment thereon rendered, the defendant has prosecuted this appeal.

The plaintiff has filed an answer to the appeal, and prayed that the allowance in his favor be increased to the amount demanded in his petition.

The case of the plaintiff as stated in his petition is as follows, viz:

"That on Friday night, June 26th, 1896, at 10 o'clock, he was walking on the public platform of the station of said railroad company at West End; (and) that, as he was so engaged, in company with a friend, engine No. 3 of said railroad company, moving in the same direction in which he was going, while switching from one track to another, so protruded over the side of the rails and upon the platform, as to strike petitioner in the side, and knock him down.

"That he fell with his legs under the wheels, and, they were broken and mangled to such an extent, that amputation was necessary."

On this statement of the cause and incidents of the accident, plaintiff charges that same was exclusively due to gross carelessness, negligence and want of skill on the part of the officers and employees of the defendant; and he avers that he could not have avoided the same, because the engine was moving backwards, no bell was rung, no light was exhibited, and no signal of any kind was given, so as to indicate its approach.

He avers that, subsequent to the accident, he was taken to the Charity Hospital, and both of his legs were amputated; and as a result of the operation, he was closely confined for a period of nine weeks, suffered great bodily pain and mental anxiety, and has been thereby deprived of his accustomed means of making a living.

The statement of the plaintiff, as a witness in his own behalf, is of the following purport, viz:

That he was about thirty-one years old at the time the accident occurred, a citizen of New Orleans, and a book-binder by trade, and had been so employed for several years; and at such work he earned $2.25 per day.

That at about the hour of 10 o'clock on the night of June 26th, 1896, he was walking down the defendant's track, at the point where the Lake View Park is situated; that is "between the bridge and the road that leads to Spanish Fort, near Lake View Park, near a switch." That as he "was walking down, (he) heard a rumbling sound like, and looked around and saw a black object; and it struck (him) and knocked him down, and rolled over (him)."

That he saw the engine pass with a head-light on the part that last rolled over him; it flashed in (his) face.

That he heard no bell ring, nor any whistle sounded.

That he was on his way to the tow-boat house to sleep, as he had often done before.

On cross-examination, the witness admitted that he had often visited West End, and was quite familiar with the situation of the defendant's tracks and switches at the terminus of its road at that place; and that he knew that, after the arrival of a train from the city, its "engine switches off and comes back on the outside track to the cut-over, and then turns back."

That on the evening of the accident, and just prior to its occurrence, he had passed through the depot, went by Lake View Park, and was "walking on the tracks with (his) back turned to the depot;" and that "while walking around there (he was) knocked down by the engine."

That he had spent the day at West End from 11 o'clock in the morning; that a portion of the time he was engaged in catching crabs, a portion of the time he spent at Mr. Winter's place, and played a few games of cards and drank a glass of beer.

One witness who was an intending passenger on the West End train on the evening of the accident, states that while "he was standing, waiting to get the train, at about 10 o'clock at night" he saw the engine but "did notice (that) it had no headlight." That he was by himself.

He explains on his cross-examination, that the engine he saw was on a train which was coming from the city; but he did not see it as it was going back, as he was then on the train.

This is the substance of the plaintiff's testimony.

On the part of the defendant, the following is a fair summary of facts, viz:

The accident occurred something more than three hundred feet from the West End station, or terminus of the road at Lake Pontchartrain.

The plaintiff was not promenading on the depot platform, but had, to all appearances, stepped to one side for the purpose of obeying a call of nature; and his position was such that he could not be readily seen by the locomotive engineer in time to enable him to avoid a collision—he having used every possible means to avert an accident, after he was discovered.

The testimony explains that, at this depot, there is a very large covered platform, arranged for the convenient entrance of passengers into, and exit from trains.

That emerging from this structure are double tracks which extend in the direction of the city; and along these tracks a long platform

extends, which terminates at the place marked "Pavillion" on the defendant's map. That pavillion is the property of a man named Dressel who owns a park which is adjacent thereto, and with which the defendant has nothing to do. That pavillion is a little more than two hundred and fifty feet from the station.

The defendant's tracks continue alongside of the pavillion, in the direction of the city.

Just beyond the pavillion, there is a high board fence, which is about three feet from the edge of the planks upon which the rails are rested.

Between the tracks and this fence, there is a space which is about eighteen inches or two feet below the level of the tracks. At the pavillion, there are two tracks extending in the direction of the city, and between them is a clear space of more than seven feet in width; and any pedestrian who wishes to use this planked right-of-way as a place to walk on, can do so without risk of coming in collision with a passing train or locomotive, if in the exercise of due and proper caution and care.

The mode of handling trains upon these tracks is for the train coming in from the city to go in on the right hand track, looking in the direction of the station, until it reaches the cross-over switch, when it crosses over to the left hand track, and enters the depot.

The engine which is at the Pontchartrain end of the depot platform is uncoupled as soon as the train comes to a halt, and, by means of a switch just beyond the end of the station, it reaches the track that passes on the outside of the picket fence in the station, passes alongside of the coal bin, goes on the cross-over switch, makes the crossing, backs down on the canal track into the station, and, being coupled to the train again at its rear end, takes it back to the city again.

Hence, it is to be expected, that, soon after the arrival of the train from the city, the engine will come out to the rear end of the station and pass along the track and over the spot where the plaintiff was injured.

Of this method of proceedure, the plaintiff was well advised, and having been well aware of the recent arrival of a train from the city on the night in question, he, in the exercise of proper care and caution, should not have *selected* the place he did for the purpose of attending to a call of nature.

The trend of all the evidence is, that, on the night of the aforesaid unfortunate occurrence, the engine was on its way from the station along the lake side track to the cross-over switch, moving at its usual and proper speed, with its head-light burning, and its bell ringing as is customary and usual.

That at a point which is about *forty feet beyond the pavillion* in the direction of the city, the plaintiff had placed himself in a very dark locality, and was to all appearances, oblivious to his surroundings and the very great danger he was in.

After the accident, several persons visited the *locus in quo,* and found the plaintiff with his trousers down at the time and loosed from the waist; and human excrement was observed upon the track—indicating the way the plaintiff was occupied when the collision occurred.

A witness who was standing in the bow of his boat, near by the scene of the accident, heard the train come up, and soon afterwards heard some one holloa: "Get out of there," or "Get out of the way, there;" then the engine was reversed, and made a considerable noise.

That he then went to the spot and found the plaintiff lying in the space between the fence and the railroad, with his trousers down to his ankles, and his person naked up to the waist.

That before leaving his boat, he looked in the direction of the engine, and saw the head-light burning, and heard the bell ringing.

The butcher-boy of the train states, that, on the evening of the accident, the engine had hooked on to a baggage car in the rear of the station, and was pulling out to go to the cross-over track, and that he was standing on the coal-bin, and got on the baggage car to ride down as far as the switch, and while standing there, he heard the bell ringing.

That he heard the engineer call out and he felt a sudden jerk, and the engine stopped. That he got down and saw a man lying on the platform where the tracks were, and his trousers were down and his shirt raised.

The foregoing are the leading and salient facts; but it must be admitted that some of them were disputed with respect to minor details by a few witnesses. But, in all essential respects, the case on the evidence, is altogether different from the case stated in the pleadings.

Instead of being on the promenade on the platform in company with a friend, the plaintiff was quite a number of feet distant from the

platform, near the cross-over switch track which the engine was bound to pass; and in a dark and unfrequented locality, where it was not expected any person would be found at so late an hour as ten o'clock at night. This case is controlled by the views expressed in Snyder vs. Railroad Company, 42nd Ann., 302, and is to be differentiated from McGuire vs. Railroad Company, 46th Ann., 1543.

We are of opinion that the verdict and judgment appealed from are erroneous, and must be reversed.

It is, therefore, ordered and decreed that the verdict of the jury and the judgment thereon based be annulled and reversed; and it is further ordered and decreed that the demands of the plaintiff be rejected at his cost in both courts.